UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13-cr-149 (RHK/LIB) |
| v. | **REPORT AND RECOMMENDATION** |
| Avery Wade Schoenborn, | |
| Defendant. | |

---

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 30]. The case has been referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on September 24, 2013, regarding the Defendant's motions for discovery[1] and suppression. For reasons outlined below, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 30], be **DENIED**.

**I.     BACKGROUND**

Wade Avery Schoenborn ("Defendant") was indicted on June 10, 2013, and made the present motion on July 8, 2013. Defendant is charged with a single count of Sexual Abuse in violation of 18 U.S.C. §§ 2242(2)(B) and 2246(2)(A). (Indictment [Docket No. 9]).[2] The Court held an evidentiary hearing on September 24, 2013, at which time the parties' request for additional time for briefing was granted. (See Minute Entry [Docket No. 46]). Defendant opted

---

[1] Defendant's discovery motions were the subject of a separate Order. [Docket No. 47].
[2] The Indictment alleges that both Defendant and the alleged victim are Indians, and that the alleged crime took place within the exterior boundaries of the Red Lake Indian Reservation, thus making federal jurisdiction appropriate under 18 U.S.C. §§ 1151 and 1153(a). (See Indictment [Docket No. 9]).

1

not to submit a brief, (see Letter to M.J. [Docket No. 48]); the Government submitted its brief on October 2, 2013. (Mem. Opp. Mot. Suppress [Docket No. 49). Defendant is presently scheduled to appear for trial before Hon. Richard H. Kyle on November 12, 2013. (See Order [Docket No. 35]).

## II. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS [Docket No. 30]

In his written Motion, Defendant asserts that any statements he made were either (1) made without the assistance of counsel in violation of his rights under the Fifth and Sixth Amendments; (2) not given freely and voluntarily; and/or (3) made without the benefit of a Miranda warning.[3] (See Docket No. 30).

The Court notes that Defendant has neither specified which, if any, statements should be suppressed for the reasons stated above, nor has he specified why any such statement should be suppressed. Defendant's counsel made no argument at the September 14, 2013, motions hearing, and did not submit a memorandum of law with regard to the present motion. (See Letter to M.J. [Docket No. 48]).

Because Defendant has not identified any specific statements that he believes should be suppressed, and has offered no factual or legal grounds for suppression, the Court could recommend denying Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 30], solely on the basis that Defendant has failed to meet his burden of production. United States v. Jones, No. 09-cr-260 (DWF/RLE), 2009 U.S. Dist. LEXIS 112286, at *10 (D. Minn. Oct. 30, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); and United States v. Quiroz, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999) (Mason, M.J.), adopted by 57 F. Supp. 2d 805, 811 (D. Minn. 1999) (Kyle, J.)), adopted by 2009 U.S.

---
[3] See Miranda v. Arizona, 384 U.S. 436 (1966).

Dist. LEXIS 112176 (D. Minn. Dec. 2, 2009) (Frank, J.). "Nonetheless, in an abundance of caution, we proceed with address[ing] the merits of the [Defendants'] Motion[s] . . . ." Id. (citing United States v. Edwards, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Mayeron, M.J.), adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.).

### A. Facts[4]

Red Lake Police Officer Jonathan Richards ("Officer Richards") was on duty during the early morning hours of May 7, 2013,[5] when he responded to a call reporting a sexual assault. The call indicated that the suspect was at Defendant's residence ("Defendant's residence" or "the residence"). Upon arriving at Defendant's residence at approximately 2:17 a.m., Officer Richards was joined by Red Lake Police Officer Jamus Veit ("Officer Veit"). Officer Richards, wearing a standard police uniform,[6] knocked on the front door, and Defendant answered. At that

---

[4] The facts in this Part are derived from the testimony of Red Lake Police Officer Jonathan Richards, Red Lake Police Officer Jamus Veit, and FBI Special Agent Joe Ogden ("Special Agent Ogden") at the September 24, 2013, motions and evidentiary hearing, and from the following Exhibits, which the Government offered, and the Court accepted into evidence for purposes of the present Motion:
- **Government's Exhibit 1**: an FBI Advice of Rights form executed by Defendant and witnessed by Special Agent Ogden and Red Lake Criminal Investigator Paul Kwako ("Investigator Kwako") at the Red Lake Jail on May 7, 2013, at 10:59 a.m.;
- **Government's Exhibit 2**: an FBI Advice of Rights form executed by Defendant and witnessed by Special Agent Ogden and FBI Special Agent Matthew A. Zavala ("Special Agent Zavala") at the Beltrami County Jail on May 15, 2013, at 2:06 p.m.;
- **Government's Exhibit 3**, a compact disc that contains a recording of the interview that Special Agent Ogden and Special Agent Zavala conducted with Defendant at the Beltrami County Jail on May 15, 2013; (the Court notes that Government's Exhibit 3 was misidentified during the September 24, 2013, motions and evidentiary hearing, in that Assistant U.S. Attorney Clifford B. Wardlaw ("AUSA Wardlaw") stated that Government's Exhibit 3 contained a recording of the May 7, 2013, interview at the Red Lake Jail; however, on the disc, itself, is written "5/15/2013 Interview of Avery Schoenborn," and the Court's review of the recording demonstrates that it is, in fact, a recording of the May 15, 2013, interview at the Beltrami County Jail); and
- **Government's Exhibit 4**, a compact disc that contains a recording of the interview that Special Agent Ogden and Investigator Kwako conducted with Defendant at the Red Lake Jail on May 7, 2013 (the Court notes that Government's Exhibit 4 was misidentified during the September 24, 2013, motions and evidentiary hearing, in that AUSA Wardlaw stated that Government's Exhibit 4 contained a recording of the May 15, 2013, interview at the Beltrami County Jail; however, the Court's review of the recording demonstrates that it is, in fact, a recording of the May 7, 2013, interview at the Red Lake Jail).

[5] During his direct examination of Officer Richards, Assistant U.S. Attorney Clifford B. Wardlaw (AUSA Wardlaw) mistakenly identified the date as May 8, 2013. During his direct examination of a later witness, AUSA Wardlaw correctly identified the date as May 7, 2013, which is consistent with Government's Exhibit 1. The mistake is immaterial to the legal issues presented by Defendant's motion.

[6] There is no evidence in the record concerning Officer Veit's attire.

3

time, Officers Richards and Veit noticed scratches on Defendant's arms and upper body. Officer Richards, still standing outside the front door of the residence while Defendant stood inside, asked how Defendant had gotten the scratches, and Defendant responded that he had been chasing kids in the woods behind the residence. Officer Richards then asked Defendant if he would step outside, but Defendant declined. Officers Richards and Veit then asked if they could come inside. Defendant initially declined; however, after Officer Richards said he could get a search warrant, Defendant gave verbal consent for Officers Richards and Veit to enter the residence.

Upon entering the residence, Officer Richards observed that Defendant appeared to be intoxicated: Defendant's eyes were watery and bloodshot, his speech was slurred, and the smell of alcohol emanated from his breath and person.[7] Additionally, Officer Richards observed that Defendant's fists were clenched and his face was "red with anger." Based on those observations, and because they were near the kitchen where Defendant might have had access to knives and/or other weapons, Officer Richards advised Officer Veit to handcuff Defendant to ensure the officers' safety, and Officer Veit did so. Officer Richards informed Defendant at that time that he was not under arrest, but that instead he was being detained in the interest of the officers' safety. Officers Richards and Veit did not ask Defendant any questions at this time.

Shortly thereafter, while still in Defendant's residence and pursuant to a telephone conversation with Red Lake Criminal Investigator Paul Kwako ("Investigator Kwako"), Officer Richards placed Defendant under arrest,[8] and after Defendant had been placed in the back of

---

[7] Officer Veit testified that he, too, smelled alcohol coming from Defendant, but stated that he did not see visible signs of intoxication.

[8] At the September 24, 2013, motions and evidentiary hearing, Officer Richards testified that he placed Defendant under arrest, and implied that he had done so inside Defendant's residence. However, Officer Veit testified that he placed Defendant under arrest, and that he did not do so until he had placed Defendant in his squad car for transport to the Red Lake Jail. Although these statements are inconsistent, the inconsistency has no effect on the legal questions raised by Defendant's motion.

Officer Veit's squad car, Officer Veit read Defendant his Miranda rights from a printed card.[9] Officer Veit asked Defendant if he understood his Miranda rights, and Defendant stated that he did. Officers Richards and Veit did not question Defendant at this time, and Officer Veit transported Defendant to the Red Lake Jail.

Defendant's residence was only about a mile from the Red Lake Jail, and the transport took less than five minutes. During this time, Officer Veit did not ask Defendant any questions. However, during the brief drive, Defendant spoke to Officer Veit concerning the alleged crime, Defendant's whereabouts at the time of the alleged crime, the scratches on his arms and body.

Upon arrival at the Red Lake Jail, Officer Veit again read Defendant a Miranda rights waiver form, which contained the same language as the card that Officer Veit had read from previously. Officer Veit asked Defendant if he understood these rights, and Defendant responded that he did.

Later that same morning, at approximately 11:00 a.m., FBI Special Agent Joe Ogden ("Special Agent Ogden") and Investigator Kwako interviewed Defendant at the Red Lake Jail. Special Agent Ogden was wearing plain clothes and, in accordance with jail policy, was not armed. The interview took place in an 8-foot-by-10-foot room with a table in the middle and chairs for all of the participants. Special Agent Ogden observed no signs that Defendant was intoxicated, or that he was otherwise distressed, and the recording (Gov't's Ex. 4) contains no indication that Defendant was intoxicated.

Special Agent Ogden began the interview by reading Government's Exhibit 1, an FBI

---

[9] During the September 24, 2013, motions and evidentiary hearing, Officer Veit read the Miranda warning from the card he used as follows:
> I'm going to read you your Miranda rights. You have the right to remain silent. Anything you say can be used against you in a court. You have a right to a lawyer for advice before we ask any questions, and to have a lawyer with you during any questioning. If you cannot afford a lawyer, one will be appointed for you if you wish. Do you understand these rights that I have read to you?

5

Advice of Rights form, to Defendant, after which he allowed Defendant to read the form himself. Defendant signed and executed the form, after which Special Agent Ogden interviewed Defendant. The Defendant was friendly and cooperative during the interview, stating repeatedly that he wanted to tell the officers the truth, and his answers tracked the interviewers' questions.

Subsequently, on May 15, 2013, Special Agent Ogden conducted a second interview with Defendant. Special Agent Ogden first located Defendant at the Red Lake Casino, where Defendant was working, and arrested him on a Federal arrest warrant. He then transported Defendant to the Beltrami County Jail. Special Agent Ogden did not interview Defendant during this transport.

After arriving at the Beltrami County Jail, Special Agent Ogden asked Defendant if he would consent to an interview, and Defendant consented. As he had before, Special Agent Ogden read to Defendant an FBI Advice of Rights form, Government's Exhibit 2, after which he allowed Defendant to read the form himself. Defendant signed an executed the form, after which Special Agent Ogden and FBI Special Agent Matthew A. Zavala ("Special Agent Zavala") interviewed Defendant. Defendant was again friendly and cooperative during this second interview—he said that he wanted to talk with the officers so that he could tell them the truth— and as with his previous interview, his answers tracked the interviewers' questions.

### B. Discussion

#### 1. Statements made at the door of Defendant's residence

##### a. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised

of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id. (internal quotation omitted).

The Eighth Circuit considers six (6) factors when determining whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the

interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347, 1349. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

**b. Analysis**

Upon a review of the Griffin factors and the totality of the circumstances, the Court finds that Defendant was not "in custody" when he spoke with Officers Richards and Veit through the doorway of his residence.

The first and second Griffin factors do not weigh heavily in the Court's analysis. The first factor does not mitigate against a finding of custody, because there is no evidence in the record that, during the encounter through the doorway of Defendant's residence, the Defendant was told that his participation in questioning was voluntary, or told that he was free to leave or to

8

request that the officers leave, or told that he was not considered under arrest. At the same time, there is no evidence in the record to suggest that the officers told Defendant that he was required to answer questions, either. Thus, the first Griffin factor does not move the needle one way or the other. See United States v. Mottl, 946 F.2d 1366, 1370 (8th Cir. 1991) (although FBI agents neither told defendant that he could terminate the interview at will, nor told him that they did not intend to arrest him, the remaining factors allowed the district court to find the interview was not custodial); United States v. Wallace, 323 F.3d 1109, 1112-13 (8th Cir. 2003) (interview was not custodial despite agents' failure to inform defendant that questioning was voluntary, that she was free to leave, or that she was not under arrest).

The second factor somewhat favors a finding that Defendant was not in custody. On the present record, the Court cannot determine whether Defendant had *unrestrained* freedom of movement while he spoke with the officers through the doorway of his residence, in part because he did not attempt to move about. See Sanchez, 676 F.3d at 631 (where defendant did not attempt to leave, second factor is unclear because "it is unclear what would have happened if she had"); United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) (where defendant "never tried to move about or leave . . . it is impossible to determine if [he] retained his freedom of movement"). However, the Court can state with certainty that Defendant's "freedom of action" as he stood inside the doorway of his own residence, while the officers stood outside, was not "curtailed to a degree associated with formal arrest." Stansbury, 511 U.S. at 322; Griffin, 922 F.3d at 1349. Therefore, the second factor weighs slightly in favor of a finding of non-custody.

With regard to the three mitigating factors, the Court in the present case looks mostly to the third factor, and concludes that Defendant voluntarily acquiesced to questioning. Defendant came to the door, opened the door, and voluntarily spoke with Officers Richards and Veit

through the open doorway.  Although Defendant did not initiate questioning, the Eighth Circuit has made it clear that the question of who initiated the interview is not dispositive for this factor, much less for the broader question of whether the interview was custodial:

> In considering the third mitigating factor, the district court correctly found that Axsom did not initiate or arrange for the questioning.  *However, the court failed to analyze the disjunctive prong of the third mitigating factor – whether the defendant voluntarily acquiesced to requests by federal agents to answer questions.*

Axsom, 289 F.3d at 501 (emphasis added).

In the present case, Defendant was inside his residence, and the officers remained outside, speaking with him through the open doorway.[10]  Defendant could have chosen not to come to the door, or he could have listened at the door and refused to answer the officers' questions.  Instead, he voluntarily chose to answer their questions.  Consequently, the Court finds that the third mitigating factor weighs heavily in favor of a finding that the interview was not custodial.

Of the three aggravating Griffin factors, only the sixth factor weighs in favor of a finding that Defendant was in custody:  Defendant was, in fact, arrested shortly after the interview.  However, the Court notes that the officers did not go to Defendant's residence in order to arrest him, nor was he arrested as a result of his answers to the officers' questions; rather, he was arrested after Officer Richards spoke with Investigator Kwako.

The fourth factor does not weigh in favor of custody, because there is no evidence that the officers used strong-arm tactics or deceptive stratagems.  The officers did not display their weapons, nor did they yell at or otherwise threaten Defendant.  See Axsom, 289 F.3d at 502 (finding no strong-arm tactics where officers "did not adopt a threatening posture toward

---

[10] The officers later entered Defendant's residence, after he gave his verbal consent to their entry; however, on the record presently before the Court, all of the questioning that took place at Defendant's residence took place before the officers entered the residence.

10

[defendant], display their weapons, or make a physical show of force during the questioning"); United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993) (finding no strong-arm tactics where investigators "did not yell at [defendant], [or] threaten him"). Nor did the officers use any deceptive stratagems, such as the good-cop, bad-cop routine. See Id. (citing "good-cop, bad-cop routine" as example of deceptive stratagem); United States v. Carter, 884 F.2d 368, 372 (8th Cir. 1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere (citing Miranda, 384 U.S. at 452, 455)). The officers "asked straightforward questions and [Defendant] gave straightforward answers." Axsom, 289 F.3d at 502 (internal quotations omitted). Finally, the officers did not make any promises to Defendant. Thus, the fourth factor does not weigh in favor of a finding of custody.

Nor does the fifth factor weigh in favor of a finding of custody, because the interview was not police dominated. In considering this factor, courts examine such considerations as the place and length of the interview. Griffin, 922 F.2d at 1348, 1352. Defendant was inside his own home throughout the interview, and in the Eighth Circuit there is a presumption that an interview in the defendant's home is not police dominated. United States v. Czichray, 378 F.3d 822, 826-27 (8th Cir. 2004). In Griffin, the Eighth Circuit indicated that an interview in a defendant's home might be police dominated when, for example, officers isolate the defendant from family or friends who might offer support, or when officers otherwise "assert[] their dominion over the interrogation site." Griffin, 922 F.2d at 1355.[11] However, none of those factors are present in this case, where, during the brief interview through the doorway, Defendant

---

[11] See also Id. at 1355, n.15:
    It is the accepted logic that an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody. Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence. After all, a person can not reasonably expect to be free anywhere if not within the refuge of his home.
(Internal citation omitted). However, another panel of the Eighth Circuit subsequently questioned the Griffin court's holding that the interview in that case was police dominated. Czichray, 378 F.3d at 827-28.

11

remained inside his home while keeping the officers outside. Although Officer Richards was armed and in uniform, and both officers arrived in their squad cars, the mere fact that the interview was conducted by uniformed officers is insufficient to warrant a finding that the interview was police dominated. See, e.g., United States v. Hephner, 103 Fed. App'x 41, 44, 48 (8th Cir. 2004) (interview by uniformed trooper in trooper's vehicle was not police dominated); United States v. Mehilove, No. 11-cr-219 (SRN/SER), 2011 U.S. Dist. LEXIS 121247, at *12 (Sept. 15, 2011) (Rau, M.J.) ("The presence of weapons and inspector uniforms did not constitute a police-dominated atmosphere."), adopted by 2011 U.S. Dist. LEXIS 117583 (Oct. 12, 2011) (Kyle, J.). In fact, where courts have found that this factor weighs in favor of custody, the atmosphere was far more police dominated than in the present case.[12] Thus, the fifth factor does not weigh in favor of a finding of custody.

Upon the totality the circumstances, in particular Defendant's voluntarily acquiescence to questioning through the doorway of his own residence, while he was standing inside and with the officers kept standing outside, the Court finds that Defendant was not in custody when he spoke with officers through the doorway of his residence. See Griffin, 922 F.2d at 1349 (strong showing on one factor may make up for deficiency in other factors). Because Defendant was not in custody, the officers were not required to provide him with a Miranda warning, and therefore, the fact that Defendant was not given a Miranda warning before questioning is not sufficient reason to suppress the statements he made to Officers Richards and Veit through the doorway of his residence.

---

[12] See, e.g., Sanchez, 676 F.3d at 631 (interview was police dominated when defendant was taken to small room in courthouse basement normally used by prosecutors and isolated with two law enforcement officers); Griffin, 922 F.2d at 1354-55 (interview was police dominated when officers confronted defendant inside his home and isolated him from his parents);

12

### 2. Statements made during transport to Red Lake Jail

There is no question that Defendant was "in custody" for purposes of Miranda when he was handcuffed in the back of Officer Veit's squad car and being transported to the Red Lake Jail. Additionally, the record before the court indicates that Defendant was read a Miranda warning before he made any statements during the transport. Thus, the only question for the Court is whether Defendant's statements were coerced or otherwise not made voluntarily.

#### a. Standard of Review

"Whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination." United States v. Pankey, No. 07-cr-214, 2007 U.S. Dist. LEXIS 86785, at *11 (D. Minn. Oct. 25, 2007) (DWF/RLE) (Erickson, C.M.J.) (citing Dickerson v. United States, 530 U.S. 428, 433-34 (2000)), adopted by 2007 U.S. Dist. LEXIS 84319 (D. Minn. Nov. 13, 2007) (Frank, J.). When analyzing voluntariness, the Court considers "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434. Furthermore, a statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations and citations omitted; ellipses in original). Whether a defendant's will has been overborne is determined by looking at the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure. United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). Courts consider a multitude of factors including the age of the defendant, the level of education of the defendant, the lack of advice to the accused on his

constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (stating that "officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. . . . None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation cause the defendant's will to be overborne" (quotations and citation omitted).).

### b. Analysis

First, the fact that Defendant appeared intoxicated while he was being transported from his residence to the Red Lake Jail does not, by itself, render his statements made during transport involuntary. As the Eighth Circuit has previously explained, "alcohol use and drug use are relevant to our analysis, but 'intoxication and fatigue do not automatically render a confession involuntary.'" United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (internal edit omitted)); see also United States v. Turner, 157 F.3d 552, 555-56 (8th Cir. 1998) (refusing to adopt a per se rule for intoxication and finding that the defendant's confession was voluntary even though the defendant was intoxicated by PCP and later exhibited "bizarre" behavior and signs of mental illness). "[T]he test is whether these mental impairments caused the defendant's will to be overborne." Casal, 915 F.2d at 1229.

The Court finds that there is no evidence to suggest that Defendant was in any way coerced into making the statements that he made during his transport from his residence to the

14

Red Lake Jail. There is no evidence whatsoever that Officer Veit engaged in any coercive tactic or exhibited any threatening behavior. In fact, the evidence in the record indicates that Officer Veit did not ask Defendant any questions, but that instead Defendant's statements were spontaneous utterances.

Thus, on the present record, the Court cannot conclude that his apparent intoxication caused Defendant's will to be overborne during the brief drive from his residence to the Red Lake Jail.

### 3. Statements made during the May 7, 2013, interview at the Red Lake Jail and the May 15, 2013, interview at the Beltrami County Jail

There is no question that Defendant was "in custody" for purposes of Miranda when he was interviewed by Special Agent Ogden and Investigator Kwako at the Red Lake Jail on May 7, 2013, and that he was also "in custody" when he was interviewed by Special Agent Ogden and Special Agent Zavala at the Beltrami County Jail on May 15, 2013 (together, the "jail interviews"). The record before the court indicates that Defendant was read a Miranda warning before each of those interviews, and that he executed signed waivers before both interviews. Thus, the question for the Court is whether Defendant's knowingly and voluntarily waived his Miranda rights.

#### a. Standard of Review

A defendant's waiver of his Miranda rights must be made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444. When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must inquire whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

15

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

"The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004). The court "must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002) (quoting United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992)). The United States Supreme Court has explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." Turner, 157 F.3d at 555 (emphasis in original) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was voluntary, knowing, and intelligently made, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." Syslo, 303 F.3d at 866.

**b. Analysis**

Based on the facts of the present case, the totality of the circumstances indicates that Defendant, after being advised of his Miranda rights and acknowledging that he understood those rights, did knowingly, voluntarily, and intelligently waive those rights.

There is no evidence of any "coercive police activity" by the interviewing agents in either the May 7, 2013, interview at the Red Lake Jail or the May 15, 2013, interview at the Beltrami County Jail. Because such coercive activity is a prerequisite to finding that a waiver was

16

involuntary, the Court cannot find that Defendant's waiver was involuntary. Thus, the remaining question is whether Defendant's waiver was knowing and intelligent.

There is no evidence that Defendant appeared intoxicated during either of the jail interviews. Although Defendant might have been intoxicated during the very early morning hours of May 7, 2013, when he was initially arrested and transported to the Red Lake Jail, his interview with Special Agent Ogden that day was not conducted until several hours later. Special Agent Ogden testified that, at the time of this May 7th interview, he observed no signs of intoxication when he interviewed Defendant at the Red Lake Jail at approximately 11:00 a.m. Furthermore, the recording of that interview, (Gov't's Ex. 4), gives no indication that Defendant was intoxicated.

Additionally, there is no indication whatsoever that Defendant had consumed any alcohol or other intoxicants, much less that he in any way appeared intoxicated, prior to the later interview on May 17, 2013, at the Beltrami County Jail.

Nor is there any evidence in the record that would suggest that Defendant's waivers executed during either of the jail interviews were not executed knowingly and intelligently.

**4. Summary**

Upon the totality of the circumstances, the Court finds that (1) Defendant was not in custody when he spoke with Officers Richards and Veit through the doorway of his residence during the very early morning hours of May 7, 2013; (2) that Defendant's statements to Officer Veit during his transport from his residence to the Red Lake Jail again during the very early morning hours of May 7, 2013, were not made in response to questioning and were made voluntarily; and (3) that Defendant knowingly, intelligently, and voluntarily waived his Miranda rights before both of the jail interviews on May 7, 2013, at the Red Lake Jail, and on May 15,

17

2013, at the Beltrami County Jail. Accordingly, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 30], be **DENIED**.

III. **CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 30], be **DENIED**.

Dated: October 9, 2013
s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge

**N O T I C E**

Upon the requests of both Parties, this Court extended the original time for both parties to prepare and file their written briefs on this suppression Motion. Consequently, and in light of the pending trial date of November 12, 2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.
Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 18, 2013, at 3:00 p.m.**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.